# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FORTIS ADVISORS LLC, as the    )
Equityholder Representative,      )
                                    )
             Plaintiff,      )
      v.                        )     C.A. No. 9522-CB
                                      )
DIALOG SEMICONDUCTOR PLC,    )
                                    )
          Defendant.    )

## MEMORANDUM OPINION

Date Submitted: November 19, 2014
Date Decided: January 30, 2015

Kevin G. Abrams, Derrick B. Farrell, J. Peter Shindel, Jr. and David A. Seal of ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Plaintiff.*

Kurt M. Heyman, Samuel T. Hirzel, II and Dawn Kurtz Crompton of PROCTOR HEYMAN LLP, Wilmington, Delaware; Neal A. Potischman, Sandra West Neukom and Alyse L. Katz of DAVIS POLK & WARDELL LLP, Menlo Park, California; *Attorneys for Defendant.*

**BOUCHARD, C.**

## I.     INTRODUCTION

This action involves a dispute over whether earn-out payments are owed to the former equityholders of iWatt, Inc. ("iWatt") resulting from the sale of iWatt to Dialog Semiconductor PLC ("Dialog") through a merger transaction that closed in 2013.  The gravamen of the case is whether Dialog breached the provision of the merger agreement obligating it to use "commercially reasonable best efforts" to achieve and pay the earn-out payments in full.  That claim is not the subject of the present dismissal motion and is proceeding through discovery.

As seems all too common in disputes over earn-out payments, the complaint in this action asserts, in the alternative to the breach of contract claim, a claim for breach of the implied covenant of good faith and fair dealing.  Notably, plaintiff admits it does not believe that any gaps exist in the merger agreement from which to imply an additional contractual term, but it nonetheless seeks to maintain the implied covenant claim as an alternative legal theory in case the Court may disagree in the future.  I reject this approach to pleading, and conclude that the failure to identify any gap in the merger agreement in which the implied covenant would operate warrants dismissal of that claim.

I also conclude that plaintiff's claims for fraud and negligent misrepresentation must be dismissed.  Among other things, the allegations of the complaint fail to satisfy the particularity requirement of Court of Chancery Rule 9(b) because the complaint does not identify the time or place of the false representations or specifically who made them.

1

## II. BACKGROUND[1]

### A. The Parties

Plaintiff Fortis Advisors LLC ("Fortis") is a Delaware limited liability corporation with its principal place of business in La Jolla, California. Under the terms of an Agreement and Plan of Merger dated as of July 1, 2013 (the "Merger Agreement"), Fortis was appointed as the representative of the former equityholders of iWatt.

Non-party iWatt, formerly a Delaware corporation, was a provider of digital power management circuits. Before its sale to Dialog, iWatt designed, developed, and marketed digital-centric power management integrated circuits for AC/DC power conversion, LED solid-state lighting, and LED display backlighting markets. After the merger closed, iWatt was operated as a separate, stand-alone business unit of Dialog known as the Power Conversion Business Group.

Defendant Dialog Semiconductor PLC is incorporated in England and Wales with its principal place of business in Green Park, United Kingdom. Dialog is a provider of highly integrated power management, audio and short-range wireless technologies.

### B. The Merger Agreement

In the Merger Agreement, which is governed by Delaware law, Dialog agreed to acquire iWatt for $310 million plus earn-out payments of up to $35 million depending on

---

[1] Unless otherwise noted, the facts recited in this Memorandum Opinion are drawn from the allegations of the Amended Verified Complaint (the "complaint") and the documents integral to or incorporated therein.

2

the post-merger revenues of Dialog's Power Conversion Business Group. Specifically, earn-out payments would be triggered if the revenues of the Power Conversion Business Group exceeded: (1) $51.3 million during the six months ended December 31, 2013 (the "First Earn-Out Period") and/or (2) $99.9 million during the nine months ended September 30, 2014 (the "Second Earn-Out Period").[2]

Aware that Dialog would take control of iWatt's operations after the merger, the parties agreed to specific contractual provisions regarding the earn-out payments and Dialog's ability to manage the business post-closing. In particular, Section 3.04 of the Merger Agreement provides, in general terms, that Dialog (referred to as "Parent") was required to use its commercially reasonable best efforts to achieve and pay the earn-out payments in full:

> From the Closing Date through the end of the Second Earnout Period, ***Parent shall, and shall cause its Affiliates . . . to, use commercially reasonable best efforts***, in the context of successfully managing the business of the Surviving Corporation, ***to achieve and pay the Earn-Out Payments in full*** (it being understood and agreed that one of the primary objectives of managing the business of the Surviving Corporation shall be to achieve and pay the Earn-Out Payments in full, provided that, subject in all respects to its obligations under this Agreement, Parent is entitled to make changes to the business in its reasonable commercial judgment in order to achieve the objectives in managing the business of the Surviving Corporation), including allocating appropriate and sufficient resources

---

[2] The actual amount of the earn-out payments was based on a scale. For the First Earn-Out Period, iWatt's former equityholders would receive at least a partial earn-out payment if iWatt's revenues exceeded $51.3 million and a total of up to $17 million in earn-out payments if iWatt's revenues exceeded $57 million during that period. For the Second Earn-Out Period, iWatt's former equityholders would receive at least a partial earn-out payment if iWatt's revenues exceeded $99.9 million and a total of up to $18 million in earn-out payments if iWatt's revenues exceeded $111 million during that period. Merger Agreement § 3.01 (Am. Compl. Ex. A).

3

(including sufficient capital expenditure, working capital and human resources) to the Surviving Corporation and its Subsidiaries to enable the achievement and payment of the Earn-Out Payments in full.[3]

The next sentence of Section 3.04 goes on to impose a number of specific obligations and prohibitions concerning Dialog's operation of the business:

> Without limiting the generality of the foregoing, (i) Parent shall, and shall cause its Affiliates . . . to (A) operate the business of the Surviving Corporation and its Subsidiaries as a separate, stand-alone business unit (understanding that Parent may elect to integrate sales, service, supply chain and administrative functions with those of Parent), (B) maintain a separate research and development organization within such business unit with engineering headcount at a level not materially below that currently maintained by the Company and (C) price the products of the Surviving Corporation on a standalone basis and without any reduction related to the pricing of products by Parent's other product lines and (ii) Parent shall not, and shall not authorize or permit its Affiliates . . . to, (A) take any action with the intent of avoiding or reducing the payment of any Earn-Out Payment, (B) divert to another business of Parent any business opportunity in a manner that could reasonably be expected to or does diminish or minimize the Earn-Out Payments, (C) take any action for the purpose of shifting Revenue outside of the Earn-Out Periods . . . or reducing Revenue . . . .[4]

### C. The Power Conversion Business Group Fails to Meet the Earn-Out Revenue Targets

On July 16, 2013, Dialog completed its acquisition of iWatt. On January 28, 2014, Dialog notified Fortis that the Power Conversion Business Group indicated revenues of $35.355 million during the First Earn-Out Period, well short of the $51.3 million revenue threshold to trigger an earn-out payment for this period under the Merger Agreement. Based on information it obtained from Dialog after the First Earn-Out Period

---

[3] Merger Agreement § 3.04(a) (emphasis added) (Am. Compl. Ex. A).

[4] *Id.*

4

ended, Fortis contends that the Power Conversion Business Group "had three key revenue shortfalls, all of which could have been easily avoided if Dialog had used commercially reasonable best efforts . . . to achieve and pay the Earn-Out Payments in full," relating to "lower than anticipated sales involving the (1) the LED lighting business; (2) Samsung; and (3) Apple."[5]

According to the Amended Verified Complaint, which was filed on July 24, 2014, before the end of the Second Earn-Out Period, certain actions taken by Dialog also made it apparent that iWatt would not achieve sufficient revenues to trigger an earn-out payment for the Second Earn-Out Period. Dialog later confirmed that its Power Conversion Business Group did not achieve sufficient revenues during the Second Earn-Out Period to trigger an earn-out payment for this period.

### D.     Procedural History

On April 9, 2014, Fortis filed its initial complaint in this action on behalf of iWatt's former equityholders. On July 25, 2014, Fortis amended its complaint. As amended, the complaint contains five counts: (1) breach of Section 3.04 of the Merger Agreement; (2) specific performance relating to the Second Earn-Out Payment (the time period for which had not yet ended when the amended complaint was filed); (3) in the alternative to Count I, breach of the implied covenant of good faith and fair dealing; (4) fraudulent inducement; and (5) in the alternative to Count IV, negligent misrepresentation. Dialog filed an answer in response to Counts I and II.

---

[5] Am. Compl. ¶ 28.

On August 8, 2014, Dialog moved to dismiss Counts III, IV, and V for failure to state a claim for relief under Court of Chancery Rule 12(b)(6) and, for the fraud-based claims, for failure to satisfy the particularity requirement of Court of Chancery Rule 9(b). I heard oral argument on this motion on November 19, 2014.

## III.    LEGAL ANALYSIS

### A.    Motion to Dismiss Under Rule 12(b)(6)

Under Court of Chancery Rule 12(b)(6), a motion to dismiss for failure to state a claim for relief must be denied unless, assuming the well-pled allegations to be true and viewing all reasonable inferences from those allegations in the plaintiff's favor, there is no "reasonably conceivable set of circumstances susceptible of proof" in which the plaintiff could recover.[6] "In determining whether a pleading meets this minimal standard, this Court draws all reasonable inferences in the plaintiff's favor, accepts all well-pleaded factual allegations as true, and even accepts 'vague allegations in the Complaint as 'well pleaded' if they provide the defendant notice of the claim.'"[7]

### B.    The Complaint Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, the implied covenant of good faith and fair dealing attaches to every contract by operation of law and "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the

---

[6] *Cent Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[7] *Seinfeld v. Slager*, 2012 WL 2501105, at *2 (Del. Ch. June 29, 2012) (quoting *Cent. Mortg. Co.*, 27 A.3d at 536).

other party to the contract from receiving the fruits' of the bargain."[8]  "[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract."[9]  "The Court must focus on 'what the parties likely would have done if they had considered the issues involved.'  It must be 'clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter.'"[10]  Where the contract speaks directly regarding the issue in dispute, "[e]xisting contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents.'"[11]  "To state a claim for breach of the implied covenant, a litigant must allege a specific obligation implied in the contract, a breach of that obligation, and resulting damages."[12]

---

[8] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985), *construing* Restatement § 205).

[9] *Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009) (citation omitted), *aff'd*, 976 A.2d 170 (Del. 2009).

[10] *Lonergan v. EPE Hldgs. LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (citations omitted).

[11] *Dunlap*, 878 A.2d at 441 (citation and internal quotation marks omitted).

[12] *Matthew v. Laudamiel*, 2012 WL 605589, at \*16 (Del. Ch. Feb. 21, 2012); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 901 A.2d 106, 116 (Del. 2006) (upholding dismissal of implied covenant claim where plaintiff failed to identify "any implied contract term that it would have the trial court read into the contract"); *Fitzgerald v. Cantor*, 1998 WL 842316, at \*1 (Del. Ch. Nov. 10, 1998).

To place the implied covenant claim in context, it is important to first review Count I of the complaint, which is not the subject of the motion to dismiss. In Count I, Fortis contends that Dialog breached Section 3.04 of the Merger Agreement by failing to "use its commercially reasonable best efforts . . . to achieve and pay the earn-out payments in full."[13] Specifically, Fortis alleges that Dialog breached Section 3.04 by taking and/or failing to take the following six actions:

> (1) failing to replace Ronald Edgerton [iWatt's former CEO] following his termination; (2) failing to replace the sales staff of Dialog's Power Conversion Business terminated by Dialog; (3) intentionally not building sufficient inventory and supply chains for the Power Conversion Business to meet the Earn-Out Revenue Goals; (4) failing to properly manage development and introduction of lower price point LED lighting solutions for the Power Conversion Business; (5) directing Dialog employees against actively marketing the Power Conversion Business' LED lighting products; and (6) interfering with sales efforts, and failing to dedicate adequate manpower and resources to the Apple and Samsung accounts.[14]

In Count III of its complaint, Fortis pleads, as an alternative to Count I, that Dialog breached the implied covenant of good faith and fair dealing by taking or failing to take these same six actions.[15] Significantly, Fortis does not identify any gap or ambiguity in

---

[13] Am. Compl. ¶ 34.

[14] Am. Compl. ¶ 35.

[15] *See* Am. Compl. ¶ 51. Five of these six items (1, 2, 3, 5 and 6) are repeated verbatim in Counts I and III. Item 4 is described slightly differently in Count I than Count III. In Count I, Fortis alleges that Dialog failed "to properly manage development and introduction of lower price point LED lighting solutions for the Power Conversion Business." Am. Compl. ¶ 35. In Count III, Fortis alleges that Dialog failed "to timely introduce scheduled lower price point LED lighting solutions for the Power Conversion Business." Am. Compl. ¶ 51. I see no substantive difference between these allegations. Both of them focus on the alleged failure to introduce "lower price point LED lighting

Section 3.04 or elsewhere in the Merger Agreement as a basis for implying an additional obligation owed by Dialog with regard to any of these six alleged actions or failures. To the contrary, Fortis expressly acknowledges that it "does not believe any" gaps exist in Section 3.04, but argues that Count III should survive just in case "the Court may disagree" down the road of this litigation.[16]

In opposition, Dialog contends that Count III should be dismissed because it is duplicative of Fortis's breach of contract claim. According to Dialog, Fortis's claim for breach of the implied covenant fails because "there is no implied obligation at issue."[17] Instead, Dialog argues, "the Merger Agreement expressly defines Dialog's obligation (*i.e.*, to use 'commercially reasonable best efforts')" and thus, "[t]his case . . . is about an alleged breach of the contract's terms."[18]

In my opinion, the allegations of the complaint fail to state a claim for breach of the implied covenant because Fortis has not identified, as it must,[19] a gap in the Merger Agreement to be filled by implying terms through the implied covenant. Stated differently, Fortis has failed to identify any implied contract term that it would have this Court read into the Merger Agreement.

---

solutions" in a manner that allegedly would have increased the revenues of the Power Conversion Business during the earn-out periods.

[16] Pl.'s Ans. Br. 12.

[17] Def.'s Op. Br. 10.

[18] *Id.*

[19] *Supra* note 12.

Instead of identifying any contractual gap or term to be implied, Fortis mimicks the language of its contract claim to argue that the same six alleged actions and failures cited as evidence of Dialog's alleged breach of Section 3.04 of the Merger Agreement were contrary to the parties' intent in the Merger Agreement because "Fortis reasonably expected that Dialog would use its best efforts to achieve and pay the earn-out payments in full during both the First and Second Earn-Out Periods," but Dialog did not.[20] The Merger Agreement, however, expressly imposed on Dialog the obligation to use "commercially reasonable best efforts to . . . achieve and pay the Earn-Out Payments in full."[21] Thus, the Merger Agreement sets a contractual standard by which to evaluate if Dialog's failure to achieve and pay the earn-out payments in its operation of the Power Conversion Business Group was improper.[22] There is no gap in the Merger Agreement to fill in this regard. Stated more generally, Count III must be dismissed because Fortis has failed to identify any "interstitial space in which the doctrine of the implied covenant might operate"[23] regarding any of the six actions or failures of Dialog that Fortis challenges in this action.

---

[20] Am. Compl. ¶ 49.

[21] Merger Agreement § 3.04 (Am. Compl. Ex. A).

[22] I assume Fortis was using shorthand in its complaint when it referenced a "best efforts" standard in Count III. Am. Compl. ¶ 49. If it was not, and was intending to suggest that a different standard should be implied, it would be improper to do so because the Merger Agreement explicitly sets the standard to be "commercially reasonable best efforts." Merger Agreement § 3.04 (Am. Compl. Ex. A).

[23] *AQSR India Private, Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009).

My conclusion is consistent with this Court's decision in *Matthew v. Laudamiel*.[24] In *Laudamiel*, the Aeosphere defendants alleged, among other things, that Matthew had breached either the LLC agreement or the implied covenant of good faith and fair dealing by refusing to attend an emergency board meeting.[25] The LLC agreement provided that Matthew was obliged to "use [his] 'best efforts' to attend all properly called meetings of the Board."[26] The Court determined that because the LLC agreement expressly required Matthew to use his best efforts, "a claim challenging Matthew's efforts to attend the emergency Board meeting [had to] be pled as a breach of contract counterclaim applying the contractually agreed-upon best efforts standard."[27]

In this case, it is equally evident from the Merger Agreement that the parties carefully negotiated the contours of Dialog's obligations to achieve and pay the earn-out payments – hence, Fortis's acknowledgement that it does not believe any gaps exist in Section 3.04. Thus, Dialog's failure to achieve the earn-out revenue thresholds must be analyzed within the confines of the express contractual obligations set forth in that provision and any other applicable provision of the Merger Agreement.[28]

---

[24] 2012 WL 605589 (Del. Ch. Feb. 21, 2012).

[25] *Id*. at *15.

[26] *Id*. at *20.

[27] *Id.*

[28] *See also Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *11 (Del. Ch. Dec. 22, 2010) (dismissing implied covenant claim for failing to expeditiously close a merger where the merger agreement contained a "reasonable best efforts" clause that included the obligation to expeditiously close the merger); *AQSR India*, 2009 WL 1707910, at *11 (dismissing implied covenant claim for "arbitrarily and in bad faith"

11

Finally, I reject Fortis's argument that its implied covenant claim should survive despite its failure to identify any gap in the Merger Agreement, simply because it has pled its implied covenant claim in the alternative. Fortis cites two cases in which the Court has permitted breach of contract and implied covenant claims to survive a motion to dismiss when pled as alternative theories for recovery. In both cases, unlike here, the plaintiff had identified an ambiguity or potential gap in a contract that could be filled by the implied covenant.[29] The right to plead alternative claims, as Court of Chancery Rule

---

determining that there had been a Material Adverse Effect because "[w]hether there was a Material Adverse Effect [was] governed by the express terms of the [stock purchase agreement]," leaving "no interstitial space in which the doctrine of the implied covenant might operate").

[29] *See Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *7-8 (Del. Ch. Apr. 20, 2009) (finding that plaintiff sufficiently pled "an implied duty to cause performance of the Supporting Agreements" where the contract was ambiguous "as to who was responsible for the bulk of the conduct alleged in [Plaintiff]'s Complaint"); *Clean Harbors, Inc. v. Safety-Kleen, Inc.*, 2011 WL 6793718, at *9 (Del. Ch. Dec. 9, 2011) (finding that the alleged facts could support a claim for breach of the implied covenant where an express term of the contract required defendant to use its "good faith discretion," but other terms of the contract to which the implied covenant might apply were potentially ambiguous as to defendant's obligations).

Fortis also relies on the post-trial opinion in *eCommerce Industries, Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678 (Del. Ch. Sept. 30, 2013). There, after concluding that the ECI parties had breached an express non-compete clause through certain indirect marketing efforts, the Court found in the alternative that the same parties had breached an implied covenant. Critical to the latter holding, the Court found that the parties to the contract "could not have foreseen the corporate structure and marketing plan" that would exist after the transaction, and that "had they seen the situation that presently exists, . . . they would have proscribed it." *Id.* at *34, *36. Thus, the Court's alternative holding followed from identifying a gap in the parties' agreement. Here, Fortis has not pled that any of the actions or failures of Dialog challenged in this action were unforeseeable and thus not addressed in the Merger Agreement. To the contrary, as discussed above, the Merger Agreement explicitly contemplated that iWatt would be operated as a separate,

12

8(e)(2) permits, "does not obviate the need to provide factual support for each theory."[30]

Here, to repeat, Fortis has challenged six alleged actions or failures of Dialog in its operation of the Power Conversion Business Group after the merger closed, but it has failed to plead the existence of any gap in the Merger Agreement in which the implied covenant could operate with respect to any of these alleged actions or failures. Accordingly, Count III fails to state a claim for relief.

### C. The Complaint Fails to Plead a Claim of Fraudulent Inducement with the Requisite Particularity

"In order for a fraud claim to survive a motion to dismiss, a plaintiff needs to allege: (1) that defendant made a false representation, usually one of fact; (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce the plaintiff to act or refrain from acting; (4) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of her reliance on the representation."[31]

Court of Chancery Rule 9(b) further requires that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . be stated with particularity." "To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation;

---

stand-alone business unit and imposed both general and specific obligations on Dialog in its management of the business after the merger closed relating to the earn-out payments.

[30] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *8 (Del. Ch. Feb. 3, 2009).

[31] *Grunstein v. Silva*, 2009 WL 4698541, at *12 (Del. Ch. Dec. 8, 2009) (citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)).

(2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[32]  The particularity requirement requires a plaintiff to allege "the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim."[33]  To support promissory fraud, a plaintiff must also "plead specific facts that lead to a reasonable inference that the promissor had no intention of performing at the time the promise was made."[34]

In Count IV of its complaint, Fortis alleges that Dialog made four materially false statements during the parties' negotiations to induce iWatt to enter into the Merger Agreement:

> [B]etween March 13, 2013 and July 1, 2013 Dialog, through statements by its CEO, Jalal Baherli, and Mark Tyndall, its Vice President of Business Development and Corporate Strategy, to Ronald Edgerton and other iWatt directors and officers, repeatedly falsely represented to iWatt it would (1) keep iWatt's existing sales force in place with substantially the same responsibilities; (2) only reduce iWatt's sales force by a small number if Dialog's existing sales staff could service some of iWatt's customers; (3) increase investments in iWatt and add new products to accelerate iWatt's growth; and (4) use Dialog's existing relationships with Samsung, Panasonic, Sony, Zumtobel, and Bosch to increase iWatt's sales.[35]

---

[32] *ABRY P'rs V, L.P. v. F & W Acq., LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[33] *Id.*

[34] *Grunstein*, 2009 WL 4698541, at *13 (citation omitted) (internal quotation marks omitted).

[35] Am. Compl. ¶ 16; *see also* Am. Compl. ¶ 57 (alleging same four false statements).

14

Fortis alleges that Dialog "had no intention to keep these promises at the time they were made"[36] and, as evidence of such, points to the fact that Dialog reduced support for iWatt's products and personnel soon after the merger closed.[37]

In seeking to dismiss Count IV, Dialog argues, among other things,[38] that the allegations of the complaint lack the particularity required under Rule 9(b) because the complaint "does not identify <u>which Dialog employee</u> allegedly made which statements, or where or when any of these statements were made."[39]  I agree.  In my opinion, the allegations underlying Count IV are deficient in several respects that, taken together, fail to satisfy the particularity requirement of Rule 9(b).

First, the complaint fails to allege in any meaningful sense when any of the alleged four misrepresentations were made.  The complaint does allege that each of the misrepresentations occurred at some time during a period of approximately 3-1/2 months from when the parties began their negotiations (March 12, 2013) until the Merger Agreement was signed (July 1, 2013).  This, however, is the functional equivalent to providing no time parameter at all because the misrepresentations logically could not have occurred during any other period of time.  In short, contrary to the purpose of the

---

[36] Am. Compl. ¶ 58.

[37] *See* Am. Compl. ¶¶ 5, 26-32, 51.

[38] Dialog also argues that all of the alleged misrepresentations were promises of future intent and that Fortis failed "to plead facts showing that the Dialog speaker(s) lacked the intention of keeping [those] promises at the time(s) that they were made."  Def.'s Op. Br. 16.  Given that I find Count IV to be deficient for failing to plead the circumstances of the alleged fraud with particularity as required under Rule 9(b), I do not decide this issue.

[39] Def.'s Op. Br. 17.

15

particularity requirement in Rule 9(b), Dialog is left to guess when Fortis contends that it allegedly made any of the four false statements attributed to it.

Pleading when the alleged misrepresentations occurred is especially important where, as here, the alleged promises are of future performance. When a fraud claim is premised on promises of future performance, a plaintiff must demonstrate that the defendant had no intention of keeping its promises at the time they were made.[40] To defend against such assertions, a defendant logically must be apprised when the alleged statements were made in order to counter the assertion that it did not intend to keep its promise at that time.[41] Fortis, however, has made no effort to provide this information.

I am unpersuaded by Fortis's reliance on this Court's decision in *Grunstein v. Silva*[42] to excuse the lack of any meaningful temporal allegations in its complaint. Although the facts in *Grunstein* are somewhat complex, simplified for relevant purposes, the case concerned two individuals (Grunstein and Dwyer) who alleged that a third individual (Silva) had entered an oral partnership agreement with them in July or August of 2005 relating to the acquisition of Beverly Enterprises, Inc., a publicly-held company

---

[40] *See supra* note 34.

[41] *See Grunstein*, at *13 ("Unlike a traditional fraud claim that allows a plaintiff to plead intent generally, because the factual predicate of a promissory fraud claim is the speaker's state of mind at the time the statement is made, a general averment of a culpable state of mind is insufficient. Instead, the plaintiff 'must plead specific facts that lead to a reasonable inference that the promissor had no intention of performing at the time the promise was made.'") (quoting *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *10 (Del. Ch. Dec. 23, 2008)).

[42] 2009 WL 4698541 (Del. Ch. Dec. 8, 2009).

that owned and/or operated nursing homes. Grunstein and Dwyer sued Silva for fraud on the theory that Silva misrepresented his intent to honor the partnership agreement and "now disclaims the very existence of a contract in the first place."[43] To demonstrate that Silva had no intention of performing the partnership agreement when it was made, Grunstein and Dwyer pointed to two principal factual allegations: "(1) that '[a]t no time from at least early September 2005 through the closing [in March 2006] did Mr. Silva ever mention Mr. Grunstein's name to WSIB [a third-party financing source for the transaction] or disclose to WSIB Mr. Grunstein's role in the Beverly Acquisition' . . . and (2) that 'Mr. Silva represented to WSIB in writing on several occasions . . . that FCP [an entity owned and controlled by Silva] had signed the Merger Agreement and paid the deposit to Beverly, when in fact *NASC* [a special purpose entity the three partners were using to facilitate the acquisition] had signed the merger agreement and *Mr. Dwyer* had put up the deposit pursuant to the agreement between the parties."[44] In the face of a Rule 9(b) challenge, the Court found the foregoing allegations to contain sufficient particularity because "Plaintiffs have asserted discrete representations by Silva at specifically delineated times during the acquisition negotiations."[45]

The underlying factual allegations in *Grunstein* differ from this case in two important respects that make *Grunstein* inapposite. The first factual allegation quoted

---

[43] *Id*. at *13.

[44] *Id.* at *13 (citation omitted).

[45] *Id*. at *14.

above concerned an *omission* of material information. In that circumstance, it is logical to tie a misrepresentation to a period of time (even one of several months) during which the information was concealed. This case, however, does not concern an omission. As explained above, Fortis's fraud claim is premised on four affirmative misrepresentations that had to have been made at some point(s) in time, which the complaint makes no meaningful attempt to particularize. As to the second factual allegation quoted above, the plaintiffs in *Grunstein* had alleged that Silva made this representation on a specific date, *i.e.*, November 4, 2005.[46] That is precisely the kind of factual detail that is missing from the complaint here.[47]

In addition to failing to particularize when any of the alleged misrepresentations were made, the complaint fails to identify who made any particular misrepresentation and to whom they were made.[48] Instead, the complaint asserts that one of two officers of

---

[46] *See id.* at *3 (citing Compl. ¶ 36).

[47] The three other cases Fortis cites in support of its argument that it has met the temporal requirement of Rule 9(b) are inapt for the same reason: in each, the plaintiff provided meaningful detail concerning when the misrepresentations were made. *See Nacco Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 27 (Del. Ch. 2009) (finding fraudulent statements alleged to have been made on specific dates over a period of time sufficient to plead a fraud claim); *Griffin Corp. Servs., LLC v. Jacobs*, 2005 WL 2000775, at *9 (Del. Ch. Aug. 11, 2005) (refusing to dismiss fraudulent misrepresentation claim where counterclaim plaintiffs alleged that false representations were made in December 2003); and *Acker v. Transurgical, Inc.*, 2004 WL 1230945, at *3 (Del. Ch. Apr. 22, 2004) (finding the time requirement satisfied where complaint alleged that fraudulent misrepresentations were made on one of two dates).

[48] *See Steinman v. Levine*, 2002 WL 31761252, at *15 (Del. Ch. Nov. 27, 2002) ("Steinman does not even identify misrepresentations made by any particular individuals. He simply lumps all the Director Defendants together in his cause of action. Steinman is

18

Dialog (either Baherli or Tyndall) made the representations, but we do not know who allegedly made which statement(s). The complaint also asserts that the representations were made to iWatt's former CEO (Edgerton) and other, unnamed directors and officers of iWatt, but we do not know who was the recipient of, or even a witness to, any particular statement.

Citing this Court's opinion in *Anvil Holding Corp. v. Iron Acquisition Co.*,[49] Fortis argues that "it is not necessary to identify what particular statements were made by specific individuals."[50] That is too broad a reading of the case. In *Anvil*, plaintiffs alleged that all of the individual defendants committed fraud by affirmatively concealing certain information from the plaintiffs at meetings held on two specific dates.[51] In other words, plaintiffs did identify who committed the misrepresentations (and when) by alleging all of the individual defendants participated in the omission of material information.[52] It does not follow from this scenario that where the alleged misrepresentations consist of false promises rather than omissions, that one is excused from identifying who made the false promises.

---

required to identify specific acts of individual defendants for his negligent misrepresentation claim to survive.").

[49] 2013 WL 2249655 (Del. Ch. May 17, 2013).

[50] Pl.'s Ans. Br. 22.

[51] *Anvil*, 2013 WL 2249655, at *5.

[52] *Id*.

Finally, the complaint makes no mention of where or by what means any of the misrepresentations were made. The complaint refers generally to "discussions" or "conversations,"[53] but it does not describe where (*e.g.*, at iWatt's offices, Dialog's offices, a mutual meeting place) or how (*e.g.*, in person, over the phone, by email) any of these communications occurred. The lack of these details, in isolation, may not warrant dismissal under Rule 9(b). But when the lack of any such details is considered together with the failure of the complaint to identify when any of the alleged misrepresentations were made and who made any of them, the complaint fails in my view to apprise Dialog of sufficient information concerning the circumstances of the alleged fraud and thus does not satisfy the particularity requirement of Rule 9(b).

## D. The Complaint Fails to State a Claim for Negligent Misrepresentation

In Count V of the complaint, Fortis asserts a claim for negligent misrepresentation based on the same allegations cited in support of its fraudulent inducement claim. A claim for negligent misrepresentation is often referred to interchangeably as equitable

---

[53] Am. Compl. ¶¶ 16, 56, 57.

fraud,[54] and Fortis itself consistently characterized Count V as a claim for equitable fraud in its briefing.[55]

"A claim of negligent misrepresentation, or equitable fraud, requires proof of all of the elements of common law fraud except 'that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly.'"[56] Because Fortis failed to plead its common law fraud claim with the requisite particularity, its negligent misrepresentation claim fails for the same reason.[57]

Fortis's negligent misrepresentation claim fails to state a claim for a second, independent reason. This Court has held that "an equitable fraud or negligent misrepresentation claim lies only if there is either: (i) a special relationship between the parties over which equity takes jurisdiction (like a fiduciary relationship) or (ii)

---

[54] *See, e.g., Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at *17 (Del. Ch. May 30, 2014) ("Equitable fraud, also known as negligent misrepresentation, . . . ."); *Envo, Inc. v. Walters*, 2009 WL 5173807, at *6 (Del. Ch. Dec. 30, 2009) ("A claim for equitable fraud or negligent misrepresentation . . . ."); *Oliver v. Boston Univ.*, 2000 WL 1091480, at *11 (Del. Ch. July 18, 2000) ("[N]egligent misrepresentation and/or equitable fraud claim.").

[55] *See* Pl.'s Ans. Br. 28-29.

[56] *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348, at *7 (Del. Ch. June 6, 2006) (citation omitted).

[57] *See Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014) (applying Rule 9(b) pleading standard to equitable fraud claim); *see also Those Certain Underwriters at Lloyd's London v. National Installment Ins. Svcs.*, 2007 WL 1207106, at *5 (Del. Ch. Feb. 8, 2007) ("Court of Chancery Rule 9(b) requires that fraud be pled with particularity. This rule almost certainly extends to negligent misrepresentation (equitable fraud) as well.") (citing *In re Dataproducts Corp. S'holders Litig.*, 1991 WL 165301 (Del. Ch. Aug. 22, 1991), reprinted at 17 Del. J. Corp. L. 1159, 1170 n. 5). Fortis does not dispute the applicability of Rule 9(b) to Count V. *See* Pl.'s Ans. Br. 28.

justification for a remedy that only equity can afford."[58] Here, no meritorious argument has been made that this case involves either circumstance. There is no allegation, for example, that Dialog owed iWatt any fiduciary duties or that there was another relationship from which equitable duties sprung.[59] To the contrary, the gravamen of the present dispute arises from a transaction that ostensibly was the product of arms-length negotiation between sophisticated parties. Finally, Count V of the complaint expressly seeks damages and not any form of equitable relief.[60]

---

[58] *Envo*, 2009 WL 5173807, at \*6 (citing *Wal-Mart Stores, Inc. v. AIG Ins. Co.*, 2006 WL 3742596, at \*2 (Del. Ch. Dec. 12, 2006)); *see also Ameristar Casinos, Inc. v. Resorts Int'l Hldgs., LLC*, 2010 WL 1875631, at \*12 (Del. Ch. May 11, 2010) ("equitable fraud can only be applied in those cases in which one of the two fundamental sources of equity jurisdiction exist: (1) an equitable right founded upon a special relationship over which equity takes jurisdiction, or (2) where equity affords its special remedies, *e.g.*, 'rescission, or cancellation; where it is sought to form a contract . . . or to have a constructive trust decreed.'") (internal quotation marks omitted) (quoting *U.S. West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at \*26 (Del. Ch. June 6, 1996) (Allen, C.)).

[59] Fortis argues "that iWatt had a pecuniary interest in Dialog's future plans for iWatt's business" and that "[b]ecause the parties had a pecuniary interest in the information that serves as the basis of Fortis' equitable fraud claim, sufficient 'special equities' for an equitable fraud claim exist." Pl.'s Ans. Br. 29 (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 147 n. 44 (Del. Ch. 2003)). In *H-M Wexford*, the Court did not address whether there existed a special relationship between the parties or whether the plaintiff sought a remedy that only equity could afford. Cases since *H-M Wexford* have held that one of these two circumstances must exist to bring a claim for negligent misrepresentation or equitable fraud. As discussed above, neither circumstance exists here.

[60] Am. Compl. ¶ 70.

## IV.  CONCLUSION

For the foregoing reasons, Dialog's motion to dismiss counts III, IV, and V of the complaint under Court of Chancery Rules (9)(b) and 12(b)(6) is GRANTED.

**IT IS SO ORDERED.**